# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before the Court Sitting *En Banc*[1]

**UNITED STATES, Appellee**

v.

**Private E2 MATTHEW L. COE**
**United States Army, Appellant**

ARMY 20220052

Headquarters, United States Army Maneuver Center of Excellence
Trevor I. Barna, Military Judge
Colonel Javier E. Rivera, Staff Judge Advocate

For Appellant: Colonel Philip M. Staten, JA; Jonathan F. Potter, Esquire; Major Bryan A. Osterhage, JA (on brief on remand).

For Appellee: Colonel Richard A. Gorini, JA; Major Justin L. Talley, JA; Lieutenant Colonel Anthony O. Pottinger, JA (on brief on remand).

Amicus Curiae for Appellant: Scott R. Hockenberry, Esquire; Brian A. Pristera, Esquire (on brief).

28 August 2025

------------------------------------------------
OPINION OF THE COURT ON REMAND
------------------------------------------------

ARGUELLES, Judge:

A military judge sitting as a general court-martial convicted appellant, contrary to his pleas, of one specification of sexual assault in violation of Article 120(b)(2)(A), Uniform Code of Military Justice, 10 U.S.C. § 920 (2019) [UCMJ].[2] The military judge sentenced appellant to be dishonorably discharged, confined for twenty-four months, and reduced to the grade of E-1. The convening authority took no action on the sentence.

---

[1] Judge ARGUELLES decided this case while on active duty.

[2] For purposes of clarity and efficiency, subsequent reference to the UCMJ will exclude citation to that work.

Sitting *en banc*, this court originally held:

> (1) because appellant was both charged and convicted of a violation of Article 120(b)(2)(A), sexual assault without the consent of the other person, there was no due process violation in the exercise of the government's charging discretion; (2) in considering whether appellant's due process rights were violated because the evidence was factually insufficient to support his conviction, [it was proper to] consider evidence that the victim was incapable of consenting due to impairment by intoxication as *circumstantial* evidence that she did not actually consent; and (3) . . . the evidence in this case was factually sufficient to support appellant's conviction.[3]

Appellant's case is now again before us following remand from the Court of Appeals for the Armed Forces [CAAF]. Specifically, the CAAF set aside our prior decision and ordered that, in light of *United States v. Mendoza*, 85 M.J. 213 (C.A.A.F. 2024), we undertake a new review under Article 66. 85 M.J. 211 (C.A.A.F. 2024). In *Mendoza*, the CAAF held that because Article 120(b)(2)(A) (sexual act without consent) and Article 120(b)(3)(A) (sexual act when the other person is incapable of consenting due to impairment by any drug, intoxicant, or other substance) are two separate theories of liability, the government cannot prove absence of consent under Article 120(b)(2)(A) "by merely establishing that the victim was too intoxicated to consent." 85 M.J. at 222. As such, the CAAF held that this court's "express reliance on the evidence of [victim's] intoxication–without any explanation of how or why that evidence factored into its analysis–raises serious questions about the legal and factual sufficiency of Appellant's conviction." *Id.* at 221-22.

After conducting a second Article 66 review in this case in light of *Mendoza*, we again find the conviction both legally and factually sufficient and therefore conclude that appellant is not entitled to any relief.

## BACKGROUND

While in airborne training, the victim, appellant, and several other soldiers decided to spend an afternoon at the river. On the way to the river, they stopped to buy brandy. Almost immediately after arriving at the river, and before the heavy drinking started, appellant and the victim had consensual sex in a wooded area away from the group. Over the course of the afternoon, the victim and a few (but not all)

---

[3] *United States v. Coe*, 84 M.J. 537, 538 (Army Ct. Crim. App. 2024) (emphasis in original).

of the soldiers drank the brandy straight from the bottle and began to play drinking games.

At some point after the drinking games began, the victim, appellant, and one other male and female soldier engaged in group consensual sexual activity with one another. The other participating female soldier, who did not drink that day, testified that although the victim appeared highly intoxicated, she was also willingly participating in, and even directing, some of the sexual conduct.

Another male member of the group, who did not partake in either the drinking or the sexual conduct, was close by and witnessed much of the group's sexual activity leading up to the act that formed the basis of appellant's sexual assault charge. Prior to walking out of sight of the victim, the non-participating soldier described a change in the victim's behavior while the victim was having sex with the other male soldier in the presence of appellant. Specifically, this witness described how the victim became less participatory in the sex with the other male soldier and appeared to be trying to cover her breasts with her hands.

Both the female soldier who participated in the sexual activity, and the male non-participating soldier, left the scene together while the victim was still having sex with the other male soldier.[4] The female soldier testified that her last recollection was that the victim "was definitely giggling, she was definitely happy, she didn't show any signs of her being upset," and did not "express any signs of non-consent."

After the other soldiers left the scene and he and the victim were alone, appellant had sex with her for the second time, which forms the basis for the charge in this case. Specifically, appellant admitted to vaginally penetrating the victim with his penis a second time for "5-7 min[ute]s." Afterwards, witnesses observed appellant and another soldier helping the victim put her bathing suit bottoms back on and cleaning her off in the river. Multiple witnesses testified that at this point the victim had trouble walking, appeared to be very intoxicated but conscious, and was carried to a car where she sat crying for a while in the air conditioning and drank water. While in the car, the sobbing victim borrowed a friend's phone and made several attempts to call a male soldier. Once the call went through, witnesses heard the victim say that she "cheated." Although several witnesses testified that the victim and the soldier she tried to call were in a serious relationship, the victim claimed that they were just friends.

---

[4] Both of these witnesses testified under grants of immunity offered in exchange for agreeing to either plead guilty to or accept nonjudicial punishment under Article 15, UCMJ, for non-sexual assault offenses.

At trial, the victim admitted to consensual sex with appellant when they first arrived at the river. She testified that after the drinking games started, she became highly intoxicated and "blacked out . . . . in and out of conscience." When asked what she remembered after becoming intoxicated, the victim testified:

> V: Next thing I remember is looking up with my clothes off, looking at the *defendant* saying "I do not want this," and then I blacked out again. (emphasis added).
>
> TC: Who was – what was happening at the time?
>
> V: At the time, [another male soldier] was in front of me, sir, and then [appellant] was off to the side penetrating [another female soldier].
>
> TC: What's the next thing you remember?
>
> V: Next thing I remember is being in a vehicle.

No other witnesses in the case heard the victim tell appellant, "I do not want this."

A sexual assault forensic nurse testified that the victim told her "that she remembers her clothes coming off, she doesn't remember who took them off, and she told them 'no, stop,' and she looked into their eyes and they saw that she was scared and then she blacked out." Admitted at trial, the narrative portion of the Sexual Assault Forensic Exam (SAFE) stated:

> I just remember them [two males] talking to me, then my clothes coming off. I don't remember who took them off, but it was a group effort. I said no stop. I told them no. I remember the boys eyes, he could see that I was scared, then I blacked out.

Additionally, one of the victim's friends testified that later that night, the victim told her she "just kept saying that something bad happened and then she kept saying, 'no,' but they weren't listening to her." That same witness also testified as to how the next day the victim told her, "she had been drinking and that she remembers looking someone in the face and telling them not to touch her, and to leave her alone, and that they didn't listen, and that a bunch of other people joined in on the assault."

The evidence at trial also revealed that appellant made several admissions: (1) he told an Army Criminal Investigation Command (CID) agent that he did not look at the victim when he had sex with her the second time because "she[] [was] super

drunk and it was wrong;" (2) when asked by the CID agent if the victim "was coherent enough to give consent for sexual acts," appellant responded "No; " (3) that he "f***** up" by not waiting to have sex with the victim "until they were sober;" and, (4) he acknowledged in a pretext text message that victim was too drunk to consent, stating "Yes she was. She was wasted."

The defense theory of the case was that *both* of the sexual encounters at the river were consensual, and that the victim fabricated the allegation of sexual assault to protect her relationship with another soldier.

## LAW AND DISCUSSION

### A. *United States v. Mendoza*

In *Mendoza*, as is the case here, the factfinder convicted appellant of only a violation of Article 120(b)(2)(A), sexual assault "without the consent of the other person." The CAAF in *Mendoza* first held that in such a sexual assault case, the government may meet its burden of proving an accused's guilt beyond a reasonable doubt with circumstantial evidence. *Id.* at 217.

On the other hand, the CAAF rejected the government's contention that evidence of intoxication *standing alone* can be sufficient to prove a violation of Article 120(b)(2)(A). *Id.* at 219-21. Although the language of Article 120(b)(2)(A) is silent as to whether the victim must be capable of consenting, in order to address due process concerns and harmonize that section with Article 120(b)(3)(A) (incapable of consent due to impairment by intoxicant when that condition is known or reasonably should be known by accused), the CAAF held that "[s]ubsection (b)(2)(A) criminalizes the performance of a sexual act upon a victim who *is capable of consenting* but does not consent." *Id.* at 220 (emphasis added). The CAAF further explained that the conflation of "two different and inconsistent theories of criminal liability" "rob[bed] the defendant of his constitutional 'right to know what offense and under what legal theory he [would] be tried and convicted,'" and therefore, violated his due process rights. *Id.* (citing *United States v. Riggins*, 75 M.J. 78, 83 (C.A.A.F. 2016)).

Nothing in the record in *Mendoza* showed how the evidence of the victim's intoxication factored into the decision of the factfinder. *Id.* at 221. Nor was there any indication as to whether the factfinder "found that [the victim] was capable of consenting but did not, or that [the victim] was incapable of consenting and thus could not." *Id.* As such, and as noted above, the CAAF in *Mendoza* found that this court's "express reliance on the evidence of [the victim's] intoxication–without any explanation of how or why that evidence factored into its analysis–raises serious questions about the legal and factual sufficiency of Appellant's conviction." *Id.* at 221-22. The CAAF concluded by reiterating:

> To be clear, our holding—that subsection (b)(2)(A) and subsection (b)(3)(A) create separate theories of liability—does not bar the trier of fact from considering evidence of the victim's intoxication when determining whether the victim consented. *See* Article 120(g)(7)(C), UCMJ ("All the surrounding circumstances are to be considered in determining whether a person gave consent."). Nothing in the article bars the Government from offering evidence of an alleged victim's intoxication to prove the absence of consent. Conversely, nothing bars the defense from offering the same evidence to sow reasonable doubt. But what the Government cannot do is prove the absence of consent under Article 120(b)(2)(A), UCMJ, by merely establishing that the victim was too intoxicated to consent.

*Id.* at 222.

The CAAF did not, however set aside the conviction, but rather remanded the matter to this court for a new review under Article 66, UCMJ. *Id.* at 223.

### B. Factual and Legal Sufficiency

#### 1. Law

Article 66(d)(1)(B), "Factual Sufficiency Review," provides:

> (i) In an appeal of a finding of guilty under subsection (b), the Court may consider whether the finding is correct in fact upon request of the accused if the accused makes a specific showing of a deficiency in proof.

> (ii) After an accused has made such a showing, the Court may weigh the evidence and determine controverted questions of fact subject to—

> (I) appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence; and

> (II) appropriate deference to findings of fact entered into the record by the military judge.

> (iii) If, as a result of the review conducted under clause (ii), the Court is clearly convinced that the finding of guilty was

> against the weight of the evidence, the Court may dismiss, set aside, or modify the finding, or affirm a lesser finding.

Pub. L. No. 116-283, § 542(b), 134 Stat. 3611-12. The amendment to Article 66(d)(1)(B) applies only to courts-martial, as here, where every finding of guilty in the Entry of Judgment is for an offense that occurred on or after 1 January 2021. *Id.* at 3612-13, 4868.

The CAAF recently addressed the application of Article 66(d)(1)(B) in *United States v. Harvey*, 85 M.J. 127 (C.A.A.F. 2024). First, the CAAF held that unless the two "trigger conditions (i.e., an assertion of an error and a showing of a deficiency)" are met, nothing in Article 66 "either requires or allows [this court] to review the factual sufficiency of the evidence." *Id.* at 130. Assuming the trigger conditions are met, the CAAF construed the requirement of "appropriate deference" to imply "that the degree of deference will depend on the nature of the evidence at issue" and held that Article 66 "affords the [Court of Criminal Appeals] discretion to determine what level of deference is appropriate." *Id.* at 130-31. The CAAF further explained:

> For example, a CCA might determine that the appropriate deference required for a court-martial's assessment of the testimony of a fact witness, whose credibility was at issue, is high because the CCA judges could not see the witness testify. In contrast, when the CCA can assess documents, videos, and other objective evidence just as well as the court-martial, the CCA might determine that the appropriate deference required is low. The statute affords the CCA discretion to determine what level of deference is appropriate, and we will review a CCA's decision only for an abuse of discretion.

*Id.* at 131; *see also United States v. Davis*, 75 M.J. 537, 546 (Army Ct. Crim. App. 2015), aff'd on other grounds, 76 M.J. 224 (C.A.A.F. 2017) (holding that "the degree to which we 'recognize' or give deference to the trial court's ability to see and hear the witnesses will often depend on the degree to which the credibility of the witness is at issue."); *United States v. Crews*, ARMY 20130766, 2016 CCA LEXIS 127, at *11-12 (Army Ct. Crim. App. 29 Feb. 2016) (mem. op.), aff'd 76 M.J. 350 (C.A.A.F. 2017) ("The deference given to the trial court's ability to see and hear the witnesses and evidence – or "recogni[tion] as phrased in Article 66, UCMJ – reflects an appreciation that much is lost when the testimony of the live witnesses is converted into the plain text of a trial transcript . . . . [The factfinder] hears not only a witness's answer, but may also *observe* the witness as he or she responds." (emphasis and first alteration in original)).

With respect to the last part of the analysis, the CAAF held "the quantum of proof necessary to sustain a finding of guilty during a factual sufficiency review is 'proof beyond a reasonable doubt,' the same as the quantum of proof necessary to find an accused guilty at trial." *Harvey*, 85 M.J. at 131. The CAAF concluded that in order for a CCA to be clearly convinced that the finding of guilty was against the weight of the evidence, two requirements must be met: "First, the CCA must decide that the evidence, *as the CCA has weighed it*, does not prove that the appellant is guilty beyond a reasonable doubt. Second, the CCA must be clearly convinced of the correctness of this decision." *Id.* at 132 (emphasis in original).

For legal sufficiency, our review is de novo. *United States v. Robinson*, 77 M.J. 294, 297 (C.A.A.F. 2018) (internal quotations and citation omitted). "The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 297-98 (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). Because we must draw "every reasonable inference from the evidence of record in favor of the prosecution," the standard for legal sufficiency "'involves a very low threshold to sustain a conviction.'" *United States v. Smith*, 83 M.J. 350, 359 (C.A.A.F. 2023) (quoting *Robinson*, 77 M.J. at 298; *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019)).

*2. Analysis*

Starting with the two "triggers" for our factual sufficiency review, given the evidence of the victim's intoxication in the underlying record, and in light of the holding of *Mendoza*, we find that appellant has satisfied the requirements to trigger our factual sufficiency review.

Similar to the trial court in *Mendoza*, the factfinder in this case did not make any specific findings or credibility determinations on the issue of whether the victim was capable of consenting when sexually assaulted. *Mendoza*, 85 M.J. at 221 ("[N]othing in the record indicates whether the military judge found that [the victim] was capable of consenting but did not, or that [the victim] was incapable of consenting and thus could not.").

What is clear from the guilty verdict, however, is that the military judge rejected the defense theory that the victim consented to the sexual conduct at issue. As such, since virtually all of the evidence on the issue of consent came from witness testimony, and given that the military judge was able to see and hear all of the witnesses, including the victim, we give a high level of deference to his factual determination that the victim did not consent to having sex with appellant for a second time.

On the issue of the victim's capacity to consent, the evidence at trial falls into roughly three categories. First is the victim's testimony, corroborated by the statements she later made to other witnesses, establishing that she was both capable of consenting and did not consent. Although she could not remember most of what happened after the group began consuming alcohol, she did remember verbalizing a lack of consent to appellant while being penetrated by another soldier *before* appellant penetrated her.

Second is the testimony of the eyewitnesses present at the scene. On the one hand, neither of these two witnesses heard the victim say to appellant, "I do not want this," and neither was present when appellant had sex with the victim the second time. On the other hand, the testimony of both witnesses painted a picture of a victim who was capable of consenting before appellant penetrated her a second time, irrespective of her intoxication. For example, the testimony that the victim appeared to be a willing participant in the group's sexual activity, until such time as she stopped and began covering her breasts, is probative evidence that the victim was capable of consenting, but did not actually consent, to the subsequent second sexual encounter with appellant.

Third are appellant's statements that indicate the victim did not consent to sex with him during the charged instance. Generally, we take appellant's admissions at face value and find them to be reliable as statements against his penal interests. Although most of his admissions involved the victim's level of intoxication, nestled in those admissions are statements indicating appellant knew the victim was capable of consenting to the second sexual encounter but did not (*e.g.*, acknowledging that he could not look at the victim while penetrating her and describing her as "f***** up, but not black out drunk. She could talk in sentences, but would stumble with her words"). In multiple statements to both CID and his fellow soldiers, appellant never once claimed that he mistakenly believed the victim consented to their second sexual encounter.

Moreover, although appellant expressed remorse for having sex with the victim while she was "too intoxicated" to consent in his CID interview, the reason why appellant believed the victim was not capable of consenting is not dispositive. Appellant's definition of too intoxicated to consent, based on his observations of the victim's symptoms of intoxication, is markedly different from the legal definition of that term. Specifically, Article 120(g)(8) defines "incapable of consenting" as a person who is "incapable of appraising the nature of the conduct at issue; or physically incapable of declining participation in, or communicating unwillingness to engage in, the sexual act at issue." Indeed, appellant's statements demonstrate that he clearly knew the difference between his consensual sex with the victim the first time, wherein she was fully participating, and the second time, after she expressed nonconsent in both her words and her behavior.

Circling back to the victim, while we acknowledge her intoxication level, we agree with the military judge, who after seeing and hearing all of the witnesses in this case, concluded that the victim's testimony that she told appellant, "I do not want this," corroborated by later statements she made to the nurse and a friend, was credible. Moreover, and for all of the reasons discussed above, we are also clearly convinced beyond a reasonable doubt that, notwithstanding her intoxication level, the victim was capable of consenting, and did not in fact consent, when she was sexually assaulted.[5]

For all the same reasons, and after drawing every reasonable inference from the evidence of record in favor of the prosecution, we find appellant's conviction is also legally sufficient.

## CONCLUSION

Upon consideration of the entire record, the finding of guilty and the sentence are AFFIRMED.

Chief Judge FLOR, Senior Judge PENLAND, Senior Judge FLEMING, Judge JUETTEN, Judge COOPER, and Judge SCHLACK, concur.

Judge ARGUELLES, joined by Senior Judge PENLAND, concurring:

Article 120(b)(2)(A), UCMJ,[6] lists two elements for the offense of sexual assault without consent: (1) "commits a sexual act upon another person," and (2) "without the consent of the other person." In *United States v. Mendoza*, however, the Court of Appeals for the Armed Forces [CAAF] added a *third* element: "Subsection (b)(2)(A) criminalizes the performance of a sexual act upon a victim *who is capable of consenting* but does not consent." 85 M.J. 213, 220 (C.A.A.F. 2024) (emphasis added). Leaving no doubt that the government must now also prove that an alleged Article 120(b)(2)(A) victim was capable of consenting, the CAAF held that "nothing in the record indicates whether the military judge found that [the victim] was capable of consenting but did not," and "ACCA's opinion affirming

---

[5] A panel of this court has previously affirmed a conviction under similar factual circumstances, even considering *Mendoza*. *See generally United States v. McTear*, ARMY 20220531, 2024 CCA LEXIS 489, at *4-7 (Army Ct. Crim. App. 13 Nov. 2024) (sum. disp. on reconsideration) (finding "no *Mendoza* problems" where victim verbally and physically indicated her lack of consent to appellant by "swatting" and "push[ing]" appellant away while stating, "stop touching me"); *United States v. Mendoza*, ARMY 20210647, 2025 CCA LEXIS 294 (Army Ct. Crim. App. 27 Jun. 2025).

[6] For purposes of clarity and efficiency, subsequent reference to the UCMJ will exclude citation to that work.

appellant's conviction did not specify whether the ACCA found that [the victim] was capable of consenting." *Id.* at 221-22.

I agree with Judge Ewing's concurring opinion on remand in *United States v. Mendoza*, 2025 CCA LEXIS 294, at *7 (Army Ct. Crim. App. 27 Jun. 2025) (Ewing, J., concurring) (mem. op. on remand) and write separately in this case to respectfully submit that, for the reasons discussed below, our superior court erred in adding a third "capable of consenting" element to Article 120(b)(2)(A). *See United States v. Allbery*, 44 M.J. 226, 228 (C.A.A.F. 1996) (holding that if a service level appellate court believes the underlying logic of one of the CAAF's decisions has changed, its recourse is "to express that viewpoint and to urge our reconsideration of our precedent").

Earlier this year, in *United States v. Valentin-Andino*, the CAAF reiterated that "[t]he first step [in statutory interpretation] is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. The inquiry ceases if the statutory language is unambiguous and the statutory scheme is coherent and consistent." 85 M.J. 361, 364-65 (C.A.A.F. 2025) (citing *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 450 (2002)) (quotation marks omitted) (second alteration in original).

As noted above, Article 120(b)(2)(A) prohibits committing a sexual act *without* another's consent. Although Article 120 defines the terms "consent" and "incapable of consenting," there is no statutory definition of "capable of consenting." This makes sense, given that there is no Article 120 offense containing a statutory element requiring the government to prove that the victim was "capable of consenting." And as Judge Ewing wrote in his *Mendoza* remand concurrence:

> "Without" is unambiguous. It means "the absence or lack of something or someone." *Merriam Webster Dictionary*, 2025 (https://www.merriam-webster.com/ dictionary/ without) (last visited June 26, 2025). A person who commits a sexual act on a person who is asleep, unconscious, or otherwise unaware of the act does so with "the absence or lack of" that person's consent to the act. In other words, having sex with someone who is legally incapable of consenting is also doing the act *without* that person's legal consent.

2025 CCA LEXIS 294, at *8-9 (Ewing, J., concurring) (emphasis in original); *see also Valentin-Andino*, 85 M.J. 365 ("When a common word or phrase in a statute lacks a unique legal meaning, a court may consult a lay dictionary in the course of defining it.") (citing *Brackett v. Focus Hope, Inc.*, 753 N.W.2d 207, 211 (Mich. 2008)); *United States v. Mathai,* 34 M.J. 33, 36 (C.M.A. 1992) (sufficient evidence

for Article 120 conviction where the trier of fact could find that the victim "was unconscious, that she could not consent to sexual intercourse, and that appellant reasonably knew or should have known that she had not so consented.").

In short, "without consent" is so unambiguous that it leaves nothing to interpret. *United States v. Schloff*, 74 M.J. 312, 314 (C.A.A.F. 2015) (finding "no basis to apply the canons [of statutory interpretation]" where the statutory language was unambiguous); *see also Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 75 (1982) (going behind the plain language of a statute in search of a possibly contrary congressional intent is a step to be taken cautiously) (citation and quotation marks omitted); *Babb v. Wilkie*, 589 U.S. 399, 413 (2020) (where the words of a statute are unambiguous, "judicial inquiry is complete." (internal quotations and citation omitted)); *Snell v. United Specialty Ins. Co.*, 102 F.4th 1208, 1226 (11th Cir. 2024) (absent a "[C]lear indication that they bear some technical or specialized sense, the words and phrases used in written legal instruments 'are to be understood in the ordinary, everyday meanings.'" (internal quotations and citation omitted)).

"Without consent" is not just unambiguous, it is simple: (1) consider a case where Person 1 performs a sexual act upon Person 2; and then (2) consider consent. Person 1 might act "with" Person 2's consent – where Person 2 is competent and freely agrees (expressed in one or more ways) to the sexual act. On the other hand, Person 1 might act "without" Person 2's consent, simply meaning the absence of the freely given agreement from a competent person. For example, Person 2 might say "No," or shake their head in refusal. Or Person 2 might be so intoxicated they are incompetent and therefore incapable of consent. In both examples, Person 1 has violated Article 120(b)(2)(A). In the second example, Person 1 has *also* violated Article 120(b)(3)(A), but that does not mean it offends due process for the government to prosecute the case under Article 120(b)(2)(A).

Notwithstanding its prior holding in *Schloff* and the plain meaning of "without consent" in *Mendoza*, the CAAF went beyond the plain language and instead looked to the surplusage canon of statutory interpretation in an attempt to harmonize Articles 120(b)(2)(A) and 120(b)(3)(A). *Mendoza*, 85 M.J. at 218-20. First, the surplusage canon does not authorize a court to add a new element to a statutory offense. *Cf. Valentin-Andino*, 85 M.J. 366 n.4 ("[W]e will not undermine [Article 66(d)(2)'s] express limitations by grafting onto it our case law concerning more generalized provisions.").

Second, to the extent the CAAF is concerned about the overlap between these two statutes, the Supreme Court has explained that overlap between criminal statutes—even *complete* overlap—does not violate due process. *See United States v. Batchelder*, 442 U.S. 114, 123-24 (1979) (holding, in relation to two firearms statutes that completely overlapped but had different sentencing schemes, that "[s]o long as overlapping criminal provisions clearly define the conduct prohibited and the

12

punishment authorized, the notice requirements of the Due Process Clause are satisfied," and noting that the Court had "long recognized that when an act violates more than one criminal statue, the Government may prosecute under either"); *see also United States v. Phillips*, 73 M.J. 572, 573 (Army Ct. Crim. App. 2014) ("This Court may not prescribe which [charge] the government should charge when there is a legal and factual basis for both.").

As Judge Ewing also points out in his *Mendoza* remand concurring opinion, "[i]n the absence of any express intent for one statute to preempt another, courts disfavor such findings, which run counter to the normal rule of prosecutorial discretion." 2025 CCA LEXIS 294, at *12 (Ewing, J., concurring) (citing *Posadas v. National City Bank*, 296 U.S. 497, 503 (1936) ("The cardinal rule is that repeals by implication are not favored"); *United States v. Morton*, 69 M.J. 12, 16 (C.A.A.F. 2010) ("It is the Government's responsibility to determine what offense to bring against an accused.")).

Along the same lines, it is not enough to show that two penalty provisions might produce different results when applied to the same facts, but "[r]ather, the legislative intent to repeal must be manifest in the 'positive repugnancy between the provisions.'" *Batchelder*, 442 U.S. at 122 (citing *United States v. Borden Co.*, 308 U.S. 188, 199 (1939)); *see also United States v. McPherson*, 73 M.J. 393, 396 (C.A.A.F. 2014) ("This Court has no license to generate a statutory conflict where none exists . . . ."); *United States v. Kick*, 7 M.J. 82, 85 (C.M.A. 1979) ("[I]t must be shown that Congress intended the other punitive article to cover a class of offenses in a complete way." (citations omitted)).

As such, to the extent CAAF's holding in *Mendoza* is based on a premise that Congress meant for Article 120(b)(3)(A) to occupy the field and foreclose the government from charging incapacity cases as "without consent" offenses under Article 120(b)(2)(A), there is simply no evidence of any such intent. To the contrary, if the government now also bears the burden of proving *capacity* to consent under Article 120(b)(2)(A), common sense dictates that evidence that the victim was intoxicated will make it *more difficult* for the government to show he or she was capable of consenting.

Moreover, as evidenced by the facts of this case, it is not atypical in the military context for an alleged sexual assault to occur in the context of young soldiers who are drinking. But, with the CAAF's holding in *Mendoza*, the government will now often find itself stuck in the "gray area" where the evidence may show an intoxicated victim to be arguably not fully capable of consenting under Article 120(b)(2)(A), yet not so intoxicated that he or she is incapable of consenting

under Article 120(b)(3)(A).[7] In short, given that Congress has clearly expressed its dissatisfaction with the number of sexual assault crimes in the military that are either not charged or result in acquittals, it is simply inconceivable that in enacting Article 120(b)(3)(A), Congress intended to make it *harder* to prosecute sexual assault crimes in the military.

Finally, it is worth pointing out that the CAAF's holding in *Mendoza* appears to render much of the statutory definition of "consent" superfluous. For example, Article 120(g)(7)(A) states that "[t]he term 'consent' means a freely given agreement to the conduct at issue by a competent person." But, if the government can only charge an Article 120(b)(2)(A) sexual assault "without consent" offense with a victim who is "capable of consenting," then why does the requirement of "by a competent person" exist? Likewise, Article 120(g)(7)(B) states that "[a] sleeping, unconscious, or incompetent person cannot consent."

But, if under *Mendoza* an accused who sexually assaults a sleeping or unconscious victim cannot be charged with sexual assault *without consent*, why does the definition of consent specifically address sleeping victims? In other words, if the government can only charge sexual assault of a sleeping person under Article 120(b)(2)(B), which does not require any showing of consent, then the definition of consent under Article 120(g)(7)(B) is superfluous as applied to a sleeping person.

In sum, for all of the reasons discussed above, I respectfully encourage the CAAF to reconsider its analysis of the interplay between Article 120(b)(2)(A) and Article 120(b)(3)(A), and completely agree with Judge Ewing's conclusion that "[a] return to the plain language would provide both fealty to the statute and clarity to the field." *Mendoza*, 2025 CCA LEXIS 294, at *14 (Ewing, J., concurring).[8]

I respectfully concur.

---

[7] In *Mendoza*, our superior court has placed plainly overlapping offenses into atextual opposition, more than mere mutual exclusion. 85 M.J. at 220. Whatever one might think about charging in the alternative, it begs the question whether that option is even viable in this context. The CAAF suggests the possibility, but it is unlikely that any future prosecution will make it as far as direct appeal where, applying *Mendoza*, the government alternatively charges under Article 120(b)(2)(A) and Article 120(b)(3)(A). Trying to prove one will mean affirmatively trying to disprove the other.

[8] Of course, Congress can also act by either amending the statute or providing additional statutory definitions.

MORRIS, Judge, joined by STEELE, Judge, and joined in part by POND, Senior Judge, dissenting:

I respectfully disagree with my colleagues in the majority regarding legal and factual sufficiency and would find the evidence both legally and factually insufficient.

We review questions of legal sufficiency de novo. *United States v. Robinson*, 77 M.J. 294, 297 (C.A.A.F. 2018) (internal citation and quotation marks omitted). "The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* at 297-98. Because we must draw "every reasonable inference from the evidence of record in favor of the prosecution," the standard for legal sufficiency "involves a very low threshold to sustain a conviction." *United States v. Smith*, 83 M.J. 350, 359 (C.A.A.F. 2023) (quoting *Robinson*, 77 M.J. at 297-98; *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019)) (internal quotation marks omitted). Further, "the deferential legal sufficiency standard impinges on the factfinder's discretion 'only to the extent necessary to guarantee the fundamental protection of due process of law.'" *United States v. Mendoza*, 85 M.J. 213, 217 (C.A.A.F. 2024) (citing *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019)) (internal quotation marks omitted). For factual sufficiency, once the accused has made a specific showing of a deficiency in proof, the court may weigh the evidence and determine controverted questions of fact subject to appropriate deference to the fact that the trial court saw and heard the witnesses and to any findings of fact the military judge entered into the record. *United States v. Harvey*, 85 M.J. 127, 129 (C.A.A.F. 2024). If, as a result of the review, this Court is "clearly convinced that the finding of guilty was against the weight of the evidence, [we] may dismiss, set aside, or modify the finding or affirm a lesser finding." *Id.* (quoting Uniform Code of Military Justice art. 66(d)(1)(B), 10 U.S.C. § 866(d)(1)(B) (2019) [UCMJ]).[9] "The quantum of proof necessary to sustain a finding of guilty during a factual sufficiency review is 'proof beyond a reasonable doubt,' the same as the quantum of proof necessary to find an accused guilty at trial. . . [b]ecause the CCA does not have to give complete deference to the court-martial . . . the CCA, during a factual sufficiency review in a particular case, might weigh the evidence differently from how the court-martial weighed the evidence." *Id.* at 131.

Acknowledging this court, and the field, did not previously have the "benefit of [the CAAF's] decision holding that Article 120(b)(2)(A), UCMJ, and Article 120(b)(3)(A), UCMJ, establish separate theories of liability . . ." the CAAF sent this case back to us for reconsideration consistent with its opinion in *Mendoza*. *United States v. Coe*, 85 M.J. 211 (C.A.A.F. 2024); *Mendoza*, 85 M.J. at 222. Of note, just as this court did not have the "benefit" of CAAF's opinion in *Mendoza*, similarly, the

---

[9] For purposes of clarity and efficiency, subsequent reference to the UCMJ will exclude citation to that work.

trial judge could not consider the decision in rendering his finding of guilt. Consequently, I take a more measured approach than my colleagues in the majority in affording limited deference to the trial judge where the trial judge may have erroneously believed appellant could be convicted either due to a lack of consent or due to the victim's inability to consent in the first instance. Considering the evidence at issue, the appropriate degree of deference required is low for two significant reasons. First, this court is similarly situated to the trial judge when reviewing appellant's video recorded interview with CID. Second, since the other relevant testimony includes the victim, whose significant memory gaps create unreliable testimony, and two other soldiers who were only present before and after the charged sexual activity, the need to evaluate witness credibility based on trial testimony is limited in this case.

I turn first to legal sufficiency. Appellant was found guilty of Article 120(b)(2)(A), which requires proof of two elements: that the accused committed a sexual act upon another person and that the accused did so without the consent of the other person. There is no dispute that a sexual act occurred between appellant and the victim, so the only question concerning this interaction is if the act occurred with the consent of the victim. Consent is "a freely given agreement to the conduct at issue by a competent person." *See* UCMJ art. 120(g)(7)(A); *United States v. Mendoza*, 85 M.J. 213, 219 (C.A.A.F. 2024). The word competent or incompetent is found 109 times in the UCMJ, but none of those locations provides a definition. In *Pease*, our Superior Court confirmed the accuracy of the Navy-Marine Corps Court of Criminal Appeals definition of competent person as "a person who possesses the physical and mental ability to consent," which properly incorporated three statutory requirements: "(1) the person must be 'competent' to consent; (2) the person cannot consent if she is asleep or unconscious, and (3) the person is incapable of consenting if she is impaired by a drug, intoxicant, or other substance, or if she is suffering from a mental disease or defect or physical disability." *generally United States v. Pease*, 75 M.J. 180, 185 (C.A.A.F. 2016) (internal citations to the statute omitted). In 2019, the *Manual for Courts-Martial* added a definition for incapable of consenting requiring that a person be "incapable of appraising the nature of the conduct at issue; or physically incapable of declining participation in, or communicating unwillingness to engage in, the sexual act at issue." UCMJ art. 120(g)(8).

In *Mendoza*, our superior court used the word capable to provide a definition for competent. 85 M.J. at 215. CAAF further confirmed, "incapable of consenting should have stated that a victim must have the ability to make *or* to communicate a decision. . ." or else they are incapable of consenting. *Pease*, 75 M.J. at 186 (internal quotations omitted) (emphasis in original). The logical inverse of that definition is that capable of consent is "a victim who has the ability to make or to communicate a decision."

Considering *Mendoza*, I must begin my analysis with determining whether the victim was competent or capable to consent. If the victim was not competent or capable at the time of penetration, the conviction for sexual assault under the theory of nonconsent is not legally sufficient. While the timeline is unclear, if we overlay the testimony of the victim with the testimony of PFC ▮ and PVT ▮ it appears the victim would have manifested a lack of consent immediately prior to manifesting a desire to continue participating in sexual acts with a different member of the group. Specifically, the victim, who does not remember the sex acts before or after this comment, testified that when she looked at appellant and said "I don't want this," her clothes were off, another soldier, PVT ▮ was in front of her, and appellant was having sex with PVT ▮ off to the side. This means, PVT ▮ had not left the group yet. According to PVT ▮ immediately prior to her leaving, the victim engaged in sexual acts with her and, when PVT ▮ was leaving, the victim attempted to encourage PVT ▮ to stay.[10] PFC ▮, the Government's witness, corroborated this portion of PVT ▮'s testimony during cross-examination when he testified to hearing the victim say "don't leave." According to PVT ▮ once PVT ▮ assured the victim she would return, the victim returned to the group and PVT ▮ saw the victim start kissing PVT ▮ again. As she was walking away, PVT ▮ testified to hearing the victim "begin to moan some more" and that it seemed to be the "[s]ame thing as before, sounded pleasurable."

The victim does not remember the sexual activity with the group or appellant, but based on testimony from both PFC ▮ and PVT ▮ about the victim being in the car the next time they saw her approximately fifteen to twenty minutes later, the sexual intercourse with appellant occurred in this short window. The victim also testified that she remembers trying to tell the group to stop, but they were "not able to understand" her. Article 120(g)(8) says a person who is "physically incapable of declining participation in, or communicating unwillingness to engage in, the sexual act at issue" is incapable of consenting. *See also, Mendoza*, 85 M.J. 213 (C.A.A.F. 2024). Inability to communicate unwillingness to engage in a sex act is the very

---

[10] In relevant part, PVT ▮ testified:

> "And I went to go sit back beside her and she asked me to finger her when [PVT ▮] pulled away from her. And so I started doing that, but I was becoming more aware of my surroundings and I started feeling overwhelmed. So I called for [PFC ▮, who is still by his speaker, and gave him like a little head nod, so that way like we could go for a walk and he understood. And so I got up, got dressed and [the victim] had came up to me and asked me to stay. She kept kissing on me, smiling, giggling, and I assumed that she wanted me to stay and continue doing sexual acts with her. . ."

definition of incapable of consent. If the victim was incapable of consent, then she was not competent and could not freely agree to participate in the sex acts. Because the victim had no memory of the sexual activity with appellant—and what she does remember includes trying to communicate while no one is understanding her—it is hard to see how a rational trier of fact could find beyond a reasonable doubt that she was competent or capable to give consent. We acknowledge the factfinder heard expert testimony that it is possible for a blacked-out person to be competent and capable to give consent, but this testimony is not a substitute for evidence that the victim was, in fact, competent and capable in this case. Thus, I determine no rational trier of fact could find beyond a reasonable doubt that she was competent or capable to give consent.

The government elicited testimony from multiple witnesses, including the victim, about the impact of a certain blood alcohol content (BAC) on behavior. The government also elicited an opinion on the victim's level of intoxication expressed on a scale of 1-10, testimony that the victim drank more alcohol than anyone else in the group, and that she was drinking directly from the bottle over a short period of time. There was testimony from witnesses who observed the victim immediately following the sex act, stating that she was visibly drunk and showing signs of alcohol poisoning, including vomiting and falling down several times. After *Mendoza*, this overwhelming evidence of intoxication would establish that she was not competent to consent in the first instance. Thus, appellant's conviction is not legally sufficient under the charged theory.

I turn now to factual sufficiency. Because the government failed to provide reliable evidence beyond a reasonable doubt, either direct or circumstantial, of the victim's lack of consent, I would find appellant's conviction for sexual assault without consent factually insufficient. Contrary to the majority's opinion, the evidence the government presented on capacity to consent is not sufficient to affirm appellant's conviction. First, notwithstanding the victim's gross memory lapses, to the extent she believes she verbalized a lack of consent to appellant, her consensual behavior immediately following was contrary to a lack of consent.

Further, when weighing the victim's testimony, it is critical to consider the victim's first account of what transpired on the day in question. At trial, the government elicited testimony from an outcry witness, PVT █ that the victim described being "raped by nine people." Similarly, during the narrative portion of her DD Form 2911, the victim stated ". . . I said no stop, I told *them* no." (emphasis added). At no point did the victim modify or clarify these initial reports that she was assaulted by the entire group. In stark contrast to this narrative, the other witnesses present at the scene described the victim joining and engaging in the group sexual encounter of her own volition.

Specifically, the evidence before the factfinder was that the victim was coherent and actively participating in sexual acts with a female and then initiating sexual acts with a male openly, where observers could witness the acts. Witnesses observed the victim exhibiting signs of intoxication at this point. But, those same witnesses testified the victim was actively participating in, and even initiating, sex acts and that she was providing a freely given agreement to those sex acts through words and actions. The victim testified that she recalled consuming alcohol and then could not recall most of the remainder of the afternoon. She did recall, however—at a point in which she was naked and another soldier was on top of her—looking over at appellant, who was engaged in sexual intercourse with another female, and stating "I do not want this." There was no evidence of any other witness hearing or acknowledging this statement, including appellant. Of critical importance, the government never followed up to clarify what the victim intended to convey with her statement "I do not want *this*." (emphasis added). In a complex sexual transaction, involving multiple parties and numerous sexual acts, it is far from clear what "I do not want *this*" conveys, especially where PVT █ suggests the victim requested more sexual acts after the victim attempted to convey this statement to the group.

Even if the victim did say "I don't want this," it would be improper for a rational trier of fact to find that the victim's affirmative lack of consent to sexual intercourse with one individual supports any inference that the victim then, subsequently, did not consent to sexual intercourse with appellant; just as a fact finder is not authorized to infer that consensual sexual intercourse with an individual earlier in the evening permits an inference that a victim must have consented to subsequent sexual intercourse with that same individual. Each sexual act is separate and distinct and stands alone as to the issue of consent. The primary evidence the victim did not consent to sexual acts with the accused is evidence suggesting the victim did not consent to sexual acts with the group at large, a suggestion that was refuted by the testimony of PVT █ and PFC █ [11] In fact, when confronted, the victim herself did not rule out the possibility that she consented to sexual acts. During cross-examination of the victim, defense counsel elicited the following testimony regarding the group encounter:

Q. You don't remember kissing anybody?

A. No, ma'am.

Q. You don't remember touching anyone during that?

---

[11] Alternatively, the evidence might suggest the victim did not consent to sex with PVT █ specifically. Notably, even this more narrow interpretation of the evidence must be considered in light of PVT █'s testimony that the victim was kissing PVT █ as PVT █ was departing the group, and after the victim supposedly attempted to communicate nonconsent.

19

A. No, ma'am.

Q. You don't remember giving oral sex to anyone?

A. No, ma'am.

Q. You do remember how it ended?

A. No, ma'am. I was very drunk.

. . .

Q. Okay. It's possible that you kissed Private [██]?

A. I mean, I guess. I don't remember it.

Q. It's possible that you kissed Private Coe during the encounter?

A. All of this is possible.

Q. Sure.

A. But it doesn't change the fact that I don't remember it, ma'am.

Q. It's also possible that you said "yes" to the group?

A. I was blacked out drunk, ma'am. If I said "yes" I do not remember it. . .

Accordingly, the victim acknowledges that she may have consented to sexual acts but that she simply does not remember doing so.

In rendering its conclusion, the majority points to distinctions between how the victim engaged in earlier sex with appellant and how she engaged during the period in question. First, I humbly contend that evidence of how an individual engages in consensual sex on one occasion does not serve as dispositive evidence of how an individual engages in consensual sex on every occasion. Furthermore, notwithstanding the majority's opinion that seems to suggest there is evidence concerning the details about the initial consensual sexual encounter between appellant and the victim from which we can draw some inference or attach some meaning; there is none. The victim did not testify about the details of that initial sexual encounter and the law enforcement agent did not ask any specific questions about that encounter during his interrogation of appellant. The evidence of record confirms only that the sexual activity occurred, and it was consensual. Thus, the majority's conclusion that this initial encounter when both parties were sober should

inform appellant's later sexual encounter with the victim, when they were both intoxicated, is misplaced.

Second, I agree with the majority's opinion that according to the testimony of eyewitnesses, at the onset of the sexual activity, the victim was capable of consent and actively participating in the sex acts. But the idea that the victim's subsequent covering of her breasts equates to a lack of consent or confirms capability is not borne out by the testimony of the eyewitnesses. There are several plausible reasons, unrelated to consent or capability, why someone might cover their breasts in a public environment. Further, despite witnessing that behavior, those same eyewitnesses testified that they walked away from the group believing she was still actively participating.

Third, the majority places a lot of emphasis on appellant's statements to law enforcement during a prolonged and highly suggestive interrogation. Many of the statements relied upon by the majority were words initiated by the CID agent as he pressured appellant to agree with his version of events. The CID agent used highly suggestive and manipulative tactics and refused to accept appellant's denials or alternate version of the facts when appellant attempted to provide his viewpoint on what transpired. Continually pressuring appellant to incriminate himself, the agent told appellant if he did not agree with the agent's version of events, then maybe this was not a "one time mistake" and appellant was someone "that takes advantage and preys on girls that are drunk." The agent also sought to add meaning to appellant's inability or unwillingness to describe what the victim was doing during the sexual encounter. Ultimately, law enforcement's interrogations of appellant focused mainly on the victim's level of intoxication and inability to consent. When questioned about whether the victim manifested any lack of consent, appellant denied the victim verbally or physically exhibited a lack of consent.

Arguably, the strongest piece of evidence supporting appellant's conviction is his statement to CID that he did not look at the victim while engaging in sexual acts with her. While at best peculiar and at worst highly concerning, this circumstantial evidence, even when considered in light of all other evidence 1) is not dispositive of criminal misconduct and 2) does not point to nonconsent versus incapacitation.

The majority also relied upon appellant's statements to another soldier that he should have waited to have sex with the victim and statements during a pretext conversation about the victim's level of intoxication as evidence of his consciousness of guilt. But, a rational trier of fact could find these statements apply to the crime of having sex with the victim when he knew she was incapable of consenting, not when he knew she did not consent. It is also possible that these statements are not criminal at all, that they merely constitute "[statements] from someone who knows they have acted inappropriately, but not criminally." *United*

*States v. Prasad*, 80 M.J. 23, 32 (C.A.A.F. 2020) (citation and internal quotations omitted).

It is worth noting that the "consciousness" of guilt evidence, in the form of appellant's interview with CID and statements to another soldier, suggests only that the accused *believed* he did something wrong. Based on his admissions, it appears clear appellant *believed* the victim was too intoxicated to consent, legally or otherwise. However, the conclusion that the victim *did not consent* to sex with appellant because appellant has a guilty conscious constitutes a logical fallacy. Further, I contend it is more likely appellant either 1) had sex with the victim when she was too intoxicated to consent or 2) had sex with the victim when she did consent and could (legally) consent, despite being heavily intoxicated.

I agree with the majority that the victim engaged in binge drinking, consensually engaged in a group sexual encounter, and over the course of the sexual encounter became more and more intoxicated. To the extent she was capable of consenting, the testimony of PVT ■ suggests the victim was still consenting, at least to certain sexual acts, after she attempted to communicate a lack of consent and as PVT ■ departed the group. From that point, only a short period of time elapsed before the victim was escorted to the car. No evidence of record explains why the victim would consent to sexual acts with PVT ■ and then, immediately afterwards, not consent to sexual acts with appellant, whom she had previously engaged in sexual acts with under similar circumstances and while sober only hours earlier. Ample evidence suggests the victim was incapable of consent.

Instead, the majority determines beyond a reasonable doubt that the victim could consent and did not consent to sexual acts with appellant. Unlike in *Mendoza,* where, despite her lack of memory, the victim offers that she would not have consented to sex because she was on her period, in this case the victim offers no explanation for why she would not have consented to the sexual encounter with appellant. *United States v. Mendoza*, 2025 CCA LEXIS 294, at *6 (Army Ct. Crim. App. 27 Jun. 2025) (mem. op. on remand). This distinction is particularly relevant in a case devoid of independent circumstantial evidence of a lack of consent that is particularized to appellant, and where the victim engaged in sexual intercourse with appellant under similar circumstances shortly before the alleged misconduct. For these reasons, I am clearly convinced that the finding of guilty was against the weight of the evidence.

Accordingly, I find appellant's conviction both legally and factually insufficient.

POND, Senior Judge, joined by MORRIS, Judge, and STEELE, Judge, dissenting:

I agree with Judge Morris that the evidence is legally insufficient to affirm appellant's conviction of sexual assault without consent in violation of Article 120(b)(2)(A) in light of *United States v. Mendoza*, 85 M.J. 213 (C.A.A.F. 2024), but I write separately to emphasize that conclusion is a result of the government pursuing at trial a different theory from the one charged. I respectfully disagree, however, with my colleague, Judge Murdough, that a rehearing is the appropriate remedy in this case.

Here, like in *Mendoza*, the charge sheet notified appellant he was being tried for sexual assault "without consent" under Subsection (b)(2)(A) of Article 120, UCMJ, and the government elected not to charge appellant with sexual assault where the victim is incapable of consenting under Subsection (b)(3)(A) of that same article. Yet, at trial, from the opening statement through the presentation of evidence and closing arguments, the government's case almost exclusively focused on the victim's incapacity to give consent due to her level of intoxication rather than a lack of consent under Subsection (b)(2)(A).[12] *See also United States v. Coe*, 84 M.J. 537, 546 (Army Ct. Crim. App. 2024) (Walker, S.J., dissenting).

Neither the parties—nor the factfinder—had the benefit of our superior court's decision in *Mendoza*. Accordingly, and as demonstrated by the record, the government proceeded under the theory that an accused who commits a sexual act upon a person who is incapable of consenting due to impairment by intoxication under Subsection (b)(3)(A) can also be guilty of committing a sexual act upon a person without consent under Subsection (b)(2)(A). This misunderstanding, in turn, shaped the evidence presented at trial. Consequently, there is an abundance of evidence of the victim's intoxication and her incapacity to consent. And there is a dearth of evidence to prove the essential element of "without consent"—that is, the

---

[12] This was also highlighted by defense counsel during closing arguments:

> The only evidence the government is using to say [the victim's] not competent, is her level of intoxication. There's a specific charge for that, Your Honor, and they could have charged that in this case. But they're trying to backdoor that theory without having to meet the higher standard and the higher burden. Had they charged too intoxicated to consent they would've had to demonstrate beyond a reasonable doubt that the accused knew or should have -- reasonably should have known of that condition . . . . The problem is now we are left trying to defend a charge against which we would've normally had an affirmative defense.

victim was capable of consenting but did not consent—to sustain a conviction under Subsection (b)(2)(A).

The evidence before the factfinder was that the victim actively engaged in sexual acts in a group of female and male soldiers near the banks of the Chattahoochee River, openly where others could see. While witnesses observed the victim participating in and initiating sexual acts with others, who were not the appellant, these same witnesses observed signs of the victim's rapidly increasing level of intoxication immediately before appellant engaged in sexual acts with the victim for the second time, which was the basis of appellant's conviction.

The victim testified she was "belligerently drunk," "very drunk," and remembered very little of what happened. One witness who observed the victim engaging in sexual acts with another—before appellant had sex with the victim a second time—testified, "it just didn't seem like [the victim] was completely fully there" and that the victim was not actively participating in what was going on. "I wouldn't say she was completely a dead fish, but she definitely was more than likely blacked out." Sometime after the sexual acts were over, other soldiers were asked to help the victim because she was drunk. The victim needed help redressing. One of these soldiers rendering aid described the victim as "unconscious" when he found her sitting in the riverbank and that "whenever she gained consciousness, it was just common drunk stupor." After observing her for 15-20 minutes, he thought they should call an ambulance because she was "excessively" showing signs of alcohol poisoning. Another soldier picked the victim up out of the water and carried her halfway back to the car because she fell over when she tried to walk by herself. Friends found the victim with leaves and sticks in her hair and scratch marks all over her, stating: "It was very clear that she was intoxicated that night."

Appellant's admissions also demonstrated that his criminality was based on the victim being "too drunk to give consent" because "she was wasted." Law enforcement's interrogation of appellant focused on the victim's level of intoxication and inability to consent.

Agent:      "You feel that she was coherent enough to give consent for sexual acts?"

Appellant:  "No."

Appellant denied the victim verbally or physically exhibited a lack of consent. When asked why he did not look at the victim while he committed sexual acts on her, appellant replied, "Because she was super drunk and it was wrong."

The majority relies upon on a few select pieces of evidence—(1) at one point during sexual intercourse with another participant, not appellant, the victim covered

her breasts; (2) the victim, while being penetrated by another male, said "I don't want this" while looking at appellant who, at the time, was having sex with another female; and (3) the victim's statements during the sexual assault nurse examination that she told the individuals who were removing her clothes "no" and "stop." None of these pieces of evidence, however, are specifically and sufficiently tied to appellant. The victim's statements in the SANE report never identified appellant as one of the individuals she told "no" and "stop" when, at the time she said this, there were a large number of persons present other than appellant. The victim's covering of her breasts—which could mean many things—occurred while another soldier, not appellant, performed sexual acts on her and while her level of intoxication was rising. When the victim said, "I don't want this," it is unclear what she meant. There was much testimony indicating the victim, at least initially, was capable of consenting and did consent to many of the other sexual acts before appellant had sex with the victim again. Thus, it is unclear what the victim meant by the statement "I don't want this." Was it that she did not want to have sex with the other male, who was not appellant? Was it that she did not want to continue having sex in the open in a group? Or was it that she did not want to have sex with anyone, including appellant? We do not know the answer to these questions because that was not the focus and theory of the government's case.[13]

The majority relies upon these pieces of evidence as proof that the victim was capable of consenting and did not consent to the sexual act with appellant. Yet, the victim's actions and words all precede appellant's conduct. This is significant because the evidence before the factfinder demonstrated overwhelmingly that at the time of appellant's conduct, the victim was not capable of consenting due to her level of intoxication. Appellant's own admissions introduced by the government at trial supported that theory. *Cf. United States v. Casillas*, ___M.J.___, 2025 CAAF LEXIS 692 at *3 (C.A.A.F. 20 Aug. 2025) (finding appellant's conviction of sexual assault without consent under Article 120(b)(2) legally sufficient where "there was a period during the sexual assault—after the victim awoke—when the victim was capable of consenting, but she did not consent to sexual activity."). In light of the evidence of the victim's intoxication, the testimony of witnesses who observed the

---

[13] As was noted in the previous dissent, the military judge at trial mistakenly stated the victim testified "she made eye contact with Private Coe at some point" when she made this statement. The victim, however, never testified she made eye contact with appellant at that moment or that he acknowledged or heard her statement, "I don't want this" while he was engaged in sex with someone else. "The military judge's mistaken characterization of the victim's testimony is particularly problematic because he was also the factfinder. Sometimes, as in this case, our ability to read the verbatim transcript affords us the opportunity to detect inconsistencies missed or misinterpreted by the factfinder." *Coe*, 84 M.J. at 545 (Walker, S.J., dissenting). We also note that the military judge's questions of the victim, as the factfinder, also focused on the amount of alcohol the victim consumed that afternoon.

victim close in time or immediately after appellant's conduct, appellant's admissions, and a lack of other evidence to show the victim was capable but did not consent to sex with appellant, I find these few select pieces of evidence relied upon by the majority to be legally insufficient to affirm appellant's finding of guilt.

Alcohol often plays some sort of role in sexual assault cases that come before this court for review. *See e.g., United States v. Mendoza,* 2025 CCA LEXIS 294 (Army Ct. Crim. App. June 27, 2025); *United States v. Roe,* 2022 CCA LEXIS 248 (Army Ct. Crim. App. 27 Apr. 2022). The presence of alcohol, however, does not preclude a conviction for sexual assault without consent under Subsection (b)(2)(A), when there is other evidence relevant to the issue of consent. *Mendoza,* 85 M.J. at 222; *see also Mendoza,* 2025 CCA LEXIS 294 (affirming appellant's conviction for sexual assault without consent); *Casillas,* ___ M.J. ___, 2025 CAAF LEXIS 692 at *4 (where victim became intoxicated, fell asleep, awoke to appellant penetrating her vulva with his penis and "testified at that in the moment she was awake" and "did not consent to this."). But in this case, there is a lack of "other evidence" relevant to the issue of consent beyond the victim's intoxication upon which a rational trier of fact could find the government met its burden of proving the element of "without consent," beyond a reasonable doubt. Had the government charged appellant with sexual assault under Subsection (b)(3)(A)—engaging in sexual acts with a person incapable of consenting due to impairment by a drug, intoxicant, or other similar substance—I would find the evidence legally sufficient, but we are bound by the government's charging decision here.

As Judge Murdough points out, our superior court's remand, unlike the remand in *Mendoza,* is not confined to a new factual and legal sufficiency review. We have been ordered to conduct "a new review" under Article 66, UCMJ, which includes, but is not limited to, a legal and factual sufficiency review of the evidence. Unlike the appellant in *Mendoza,* the appellant during his first appeal to this court alleged the government charged him with committing sexual assault without consent, while the government's evidence and theory at trial was sexual assault while the victim was incapable of consenting in violation of his right to due process.

This is exactly what our superior court said the government cannot do: "charge one offense under one factual theory and then argue a different offense and a different factual theory at trial" which "robs the defendant of his constitutional 'right to know what offense and under what legal theory he will be tried and convicted.'" *Mendoza,* 85 M.J. at 220 (quoting *United States v. Riggins,* 75 M.J. 78, 83 (C.A.A.F. 2016)). Arguably, like the appellant in *Riggins,* appellant in this case "was not on notice that he needed to, or even could, defend against the charges by contesting the issue of lack of consent," 75 M.J. at 84, by arguing the victim was incapable of consenting. On the other hand, "the manner in which the case was contested diminishes any argument that Appellant was not on notice as to what he had to defend against." *United States v. Oliver,* 76 M.J. 271, 275 (C.A.A.F. 2017).

26

An accused also takes notice from the charge sheet. *United States v. Jones,* 68 M.J. 465 (C.A.A.F. 2010). And here, appellant was charged with committing sexual assault without consent in violation of subsection (b)(2)(A) of Article 120, UCMJ. In that respect, *Riggins* is distinguishable. The appellant in *Riggins* was charged with one offense under Article 120, UCMJ and convicted of another offense under Article 128, UCMJ, the latter of which the CAAF determined was not a lesser included offense. *Riggins*, 75 M.J. at 85. Thus, the appellant in *Riggins* was not on notice of the Article 128, UCMJ charge, in violation of his right to due process. *Id.* In contrast, appellant here was not charged with one offense and convicted of another offense. *Compare United States v. Tunstall*, 72 M.J. 191, 196 (C.A.A.F. 2013) (appellant's improper conviction of indecent acts as a lesser included offense of aggravated sexual assault violated appellant's right to due process); *United States v. Marshall*, 67 M.J. 418 (C.A.A.F. 2009) (appellant charged with escaping custody from a certain captain and convicted of escaping custody from a certain staff sergeant was prevented from being able to defend against the charge of which he was convicted contrary to fundamental due process); *United States v. Miller*, 67 M.J. 385, 388 (C.A.A.F. 2009) (appellate court's affirmance of a finding of guilty of an offense that was neither charged nor constituted a lesser included offense was error and a denial of due process). Rather, appellant was charged with—and had notice of—the offense of committing sexual assault without consent and was convicted of committing sexual assault without consent.

Fair notice, however, is not the government's only due process obligation. The government must also prove beyond a reasonable doubt all of the elements of the offense of which an accused is charged. *United States v. Girouard*, 70 M.J. 5, 10 (C.A.A.F. 2011) (discussing the government's dual due process obligations of fair notice and proof beyond a reasonable doubt under the Fifth and Sixth Amendments) (citations omitted); *see also Marshall*, 67 M.J. at n.3 (C.A.A.F. 2009) ("The fact that two alternative theories of a case may both involve criminal conduct does not relieve the government of its due process obligations of notice to the accused and proof beyond a reasonable doubt of the offense alleged."). While appellant had fair notice of the offense of which he was charged as reflected on the charge sheet, the government nevertheless failed to prove beyond a reasonable doubt every element of the charged offense of sexual assault without consent in violation of appellant's right to due process.

Because the parties and the factfinder did not have the benefit of our superior court's decision in *Mendoza*, it may be appealing to remand the case for a new trial, but I find that neither our precedent nor our statutory authority permits such a remedy when this court sets aside the findings for insufficiency of the evidence. Article 66(f)(1)(A), UCMJ (prohibiting ordering a rehearing in cases where jeopardy has attached under Article 44, UCMJ). The statute authorizes the court to order a rehearing when setting aside the findings under Article 66(f), UCMJ, "except when prohibited by section 844 of this title (article 44) . . . ." Article 44, UCMJ, "Former

Jeopardy" provides, in part: "No person may, without his consent, be tried a second time for the same offense." *Compare* U.S. Const. amend. V, cl. 2 ("[n]o person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb."). Previous versions of Article 66, UCMJ contained different language and instead of referring to Article 44, UCMJ, stated a rehearing was authorized when the court set aside the findings (and sentence), "except where the setting aside is based on *lack of sufficient evidence* in the record to support the findings . . ." Article 66, UCMJ (2016) (emphasis added). Regardless of these differences in language, both versions of the statute accord with the Supreme Court's decision in *United States v. Scott*, which stated: "The successful appeal of a judgment of conviction, on any ground other than the insufficiency of the evidence to support the verdict [...] poses no bar to further prosecution on the same charge.") 437 U.S. 82, 90-91 (1978) (internal citation omitted). Thus, if our decision is based on an insufficiency of the evidence, the government is barred from further prosecuting the case and a rehearing is not authorized.

Furthermore, there has been no subsequent change in the law that applies retroactively to appellant's court-martial proceedings. In *Mendoza*, our superior court merely clarified what the state of the law was at the time of appellant's trial. Thus, I do not believe a rehearing is an authorized remedy. For all these reasons, I would set aside appellant's findings of guilty and dismiss the charge and specification as legally insufficient.

MURDOUGH, Judge, dissenting:

I agree with almost everything my colleagues have written. I agree with the majority that evidence in the record indicates that the victim "was capable of consenting, and did not in fact consent." *United States v. Coe*, __ M.J. __, slip op. at X (Army Ct. Crim. App. X Mon. 2025). I also agree with Judge Morris that there is "evidence of intoxication [that] would establish that she was not competent to consent in the first instance." *Id.* at X. I agree with Senior Judge Pond that both are true because "[n]either the parties—nor the factfinder—had the benefit of our superior court's decision in *Mendoza*." *Id. at* X. And I agree with the tenor of Judge Arguelles' concurring opinion that *Mendoza* appears to read an additional element into Article 120(b)(2)(A) that is at odds with the statutory text, and I respectfully join in his recommendation to our superior court to reconsider or clarify its opinion in *Mendoza. Id.* at X. But I respectfully part ways with my colleagues on how *United States v. Mendoza*, 85 M.J. 213 (C.A.A.F. 2024), affects this case. I would set aside the guilty finding and the sentence and authorize a rehearing.

On remand, the Court of Appeals for the Armed Forces [CAAF] directed us, in light of *Mendoza*, to conduct "a new review under Article 66, Uniform Code of Military Justice, 10 U.S.C. § 866." *United States v. Coe*, 85 M.J. 211 (C.A.A.F.

2024) (remand order).[14] Both the majority and my fellow dissenting judges approach this case through the lens of legal and factual sufficiency. However, the essential holding of *Mendoza* is that "incapable of consenting" and "without consent" are different theories of liability, and the government "conflat[ing] two different and inconsistent theories of criminal liability raises significant due process concerns." 85 M.J. at 215 (cleaned up). I would apply the same approach here.

While this case was on direct review, the CAAF decided *Mendoza,* which our superior court acknowledged was a significant holding. 85 M.J. at 222. The record demonstrates that both parties and the military judge operated under the belief that evidence of the victim's incapability to consent due to intoxication was competent circumstantial evidence "that the victim did not, in fact, consent." *United States v. Roe,* 2022 CCA LEXIS 248, at *14 (Army Ct. Crim. App. 27 Apr. 2022) (mem. op.), pet. denied, 83 M.J. 83 (C.A.A.F. 2022).[15] Evidence of intoxication appears alongside other evidence of non-consent; neither party nor the judge made any serious effort to distinguish between the two theories, likely because they did not consider them to be inconsistent theories of liability. Thus, it is unsurprising that, just like in *Mendoza,* "nothing in the record indicates whether the military judge found that [the victim] was capable of consenting but did not, or that [she] was incapable of consenting and thus could not." 85 M.J. at 221; *see also United States v. Harcrow,* 66 M.J. 154, 160-61 (C.A.A.F. 2008) (Ryan, J., concurring) (plain error occurs when a superior court announces a "new rule" while a case is on direct review, but that does not mean the military judge "did anything wrong."). Without that clarity, neither we nor the appellant can "know what offense and under what legal theory he [was] tried and convicted," which creates an unacceptable risk that the conviction violates due process. *Mendoza,* 85 M.J. at 220 (quoting *United States v. Riggins,* 75 M.J. 78, 83 (C.A.A.F. 2016)).

In deciding how to remedy the due process error, I take my cue from our superior court's decision in *United States v. Hukill,* 76 M.J. 219 (C.A.A.F. 2017), extending the likewise-significant holding of *United States v. Hills,* 75 M.J. 350 (C.A.A.F. 2016), to trials by military judge alone. In *Hukill,* the CAAF noted "The

---

[14] The scope of our review on remand in this case is broader than in *Mendoza.* In *Mendoza,* we were directed specifically to perform "a new factual and legal sufficiency review under Article 66," whereas in this case the remand order directs a complete "new review" under Article 66, UCMJ. *Compare Mendoza,* 85 M.J. at 223, *with Coe,* 85 M.J. 211. Also in this case, the due process violation was an asserted error on the initial appeal to this court. *United States v. Coe,* 84 M.J. 537, 539-40 (Army Ct. Crim. App. 2024).

[15] We recognize denial of a petition for review "does not suggest that [our superior court] either agree[s] or disagree[s] with the merits of [our] resolution of the case." *United States v. McGriff,* 78 M.J. 487, 487 (C.A.A.F. 2019).

military judge cannot be faulted for applying the accepted law at the time, however, after *Hills*, that interpretation of the law was no longer correct." 76 M.J. at 223. [16] Replace "*Hills*" with "*Mendoza*," and that sentence perfectly describes the present case. And in *Hukill,* our superior court remedied the due process violation by setting aside the findings and sentence, but also authorizing a rehearing. *Id.*

I begin and end with the essential holding of *Mendoza* – that due process is violated when an accused is charged under one theory but tried and convicted under another. *Id.* at 222. Rather than assessing the sufficiency of the evidence by comparing the quanta of evidence that would support each theory, I would set aside the guilty finding and the sentence, and authorize a rehearing before a new trier of fact to properly apply the law as interpreted by the CAAF in *Mendoza*.

FOR THE COURT:

JAMES W. HERRING, JR.
Clerk of Court

---

[16] This is not a case where the actions of the government and military judge produced a trial record that is so "irredeemably muddled" that appellate review is impossible, and a rehearing would further exacerbate the due process violation. *See United States v. Honea*, 77 M.J. 181, 185 (C.A.A.F. 2018).